# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| _____ )<br>UNWIRED PLANET, LLC, )<br> )<br>       Plaintiff, )<br> )<br>      vs. )<br> )<br>SQUARE, INC., )<br> )<br>      Defendant. )<br>_____) | 3:13-cv-00579-RCJ-WGC<br><br>**ORDER** |

       This case arises out of the alleged infringement of three patents concerning wireless technology.  Pending before the Court are the parties' claim construction ("*Markman*") briefs and a Motion to Stay (ECF No. 71).  For the reasons given herein, the Court denies the motion to stay and issues the present *Markman* Order.

## I.  FACTS AND PROCEDURAL HISTORY

       Plaintiff Unwired Planet, LLC owns by assignment U.S. Patent No. 7,711,100 (the "'100 Patent"), entitled "System and Method for Controlling Financial Transactions Over a Wireless Network," U.S. Patent No. 7,376,433 (the "'433 Patent"), entitled "Subscriber Delivered Location-Based Services," and U.S. Patent No. 8,275,359 (the "'359 Patent"), entitled "Wireless User Based Notification System," (collectively, the "Patents"). (First Am. Compl. ¶¶ 14–16, ECF No. 30)  Plaintiff informed Defendant Square, Inc. of its infringement of the '100 and '433

Patents on September 26, 2013 and informed Defendant of the infringement of the '359 Patent via service of the Summons and Complaint on October 23, 2013. (*See id.* ¶¶ 20–21; Proof of Service, ECF No. 14, at 2).

Plaintiff sued Defendant in this Court under 35 U.S.C. § 271(a)–(c) for direct, indirect, and contributory patent infringement of the Patents via Defendant's various products and services. (*See id.* ¶¶ 19, 21–22).  The magistrate judge issued the Discovery Plan and Scheduling Order ("DPSO") on March 17, 2014, ordering phased discovery. (*See* DPSO, ECF No. 47). Phase I discovery was limited to that necessary to file *Markman* briefs and participate in the initial settlement conference: initial disclosures; infringement, noninfringement, invalidity, and unenforceability contentions under the Local Patent Rules; claim construction disclosures; damages estimates; depositions of claim construction experts; a limited deposition under Rule 30(b)(6); and any future licensing agreements. (*See id.* 2–6).  Phase II is to include general discovery, i.e., any remaining discovery, and it is to begin immediately after the issuance of the present *Markman* Order and end 180 days thereafter. (*See id.* 3, 7).  The *Markman* briefs have been received and a *Markman* hearing held.  Nine months after Plaintiff filed the action, four months into discovery, and the day before Plaintiff's *Markman* brief was filed, Defendant filed a petition for Covered Business Method ("CBM") review with the Patent Trial and Appeals Board ("PTAB") as to the '100 Patent and filed petitions for Inter Partes Review ("IPR") with the PTAB as to the '433 and '359 Patents.  Defendant has asked the Court to stay the present case based on those filings.

///

///

///

II.     **LEGAL STANDARDS**

A.      **Stays**

Pursuant to the America Invents Act ("AIA"), a district court may issue a stay when a party has filed a petition for CBM review with the PTAB with respect to a patent claim currently in litigation before the district court. *See* Leahy–Smith America Invents Act § 18, Pub. L. No. 112-29, 125 Stat. 284 (2011) (§ 18 not codified).  In considering whether to grant a stay, a district court is to consider: (1) whether a stay, or the denial thereof, would simplify the issues in question and streamline the trial; (2) whether discovery is complete and whether a trial date has been set; (3) whether a stay, or the denial thereof, would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and (4) whether a stay, or the denial thereof, would reduce the burden of litigation on the parties and on the court. *See id.* § 18(b)(1)(A)–(D).

The Court of Appeals appears to have issued only one reported decision reviewing a district court's grant or denial of a stay under § 18. *See VirtualAgility v. Salesforce.com*, --- F.3d ----, 2014 WL 3360806 (Fed. Cir. 2014).  In that case, the Court of Appeals reversed a district court's denial of a stay two months after the PTAB had granted a petition to institute CBM proceedings. *See id.* at *1.[1]  The Court of Appeals ruled that the district court erred in discounting the PTAB's determination that the petitioner was more likely than not to succeed at trial in the PTAB. *See id.* at *5 ("The district court erred as a matter of law to the extent that it decided to 'review' the PTAB's determination that the claims of the '413 patent are more likely than not invalid in the posture of a ruling on a motion to stay.  Under the statutory scheme, district courts have no role in reviewing the PTAB's determinations regarding the patentability

---

1 The Court of Appeals has interlocutory jurisdiction to review district court rulings on stay requests under § 18(b)(2) of the AIA.

of claims that are subject to CBM proceedings.").  The Court of Appeals has not issued a

decision reviewing the grant or denial of a stay made *before* the PTAB has ruled whether to grant

a petition, and it has expressly stated that "it [i]s not error for [a] district court to wait until the

PTAB ma[kes] its decision to institute CBM review before it rule[s] on [a] motion [to stay]." *Id.*

at *7.  The Court of Appeals noted that some district courts, but not all, have denied § 18(b)(1)

motions as premature when filed before the PTAB renders a decision whether to grant a pending

CBM petition. *See id.* ("We express no opinion on which is the better practice.  While a motion

to stay could be granted even before the PTAB rules on a post-grant review petition, no doubt the

case for a stay is stronger after post-grant review has been instituted.").

>    **B.**     **Claim Construction**

The construction of terms found in patent claims is a question of law to be determined by

the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc),

*aff'd*, 517 U.S. 370 (1996).  "[T]he interpretation to be given a term can only be determined and

confirmed with a full understanding of what the inventors actually invented and intended to

envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Consequently, courts construe claims in the manner that "most naturally aligns with the patent's

description of the invention." *Id.*

The first step in claim construction is to look to the language of the claims themselves.

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which

the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure

Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  A

disputed claim term should be construed in light of its "ordinary and customary meaning," which

is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.*  In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily apparent, and claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.  Moreover, a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy."); *see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in the non-construction of the word "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in the lower court's refusal to construe "irrigating" and "frictional heat").

Claim construction may deviate from the ordinary and customary meaning of a disputed term only if: (1) "a patentee sets out a definition and acts as his own lexicographer"; or (2) "the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Ordinary and customary meaning is not always the same as the dictionary definition. *Phillips*, 415 F.3d at 1321.

> Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent.  Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.*  "Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  It is therefore "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of claims." *Phillips*, 415 F.3d at 1315.  Courts can also look to the prosecution history as part of the intrinsic record to determine how the Patent Office and the inventor understood the patent. *Phillips*, 415 F.3d at 1317.  However, the prosecution history lacks the clarity of the specification and is often less useful for claim construction purposes. *Id.*

Finally, "[a] court may, in its discretion, receive extrinsic evidence in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." *Markman*, 52 F.3d at 980 (internal citations and quotation marks omitted).  Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.*  Although such evidence may aid the court in construing claim terms, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.  Thus, "while extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation marks omitted).

///

///

///

///

III.     ANALYSIS

    A.     Motion to Stay

    1.     CBM

Defendant is correct that discovery is not yet complete and will not be complete until six months after the present *Markman* Order issues, and that no trial date has been set.  Much discovery had already been conducted when Defendant filed the motion to stay, however.  Although "general" discovery had not yet been completed, a detailed examination of the DPSO, *see supra*, reveals that much of the critical discovery had already taken place.  In light of the scope of Phase I discovery under the DPSO, the Phase II "general" discovery does not appear to include the majority of the important discovery.  Also, the present *Markman* Order will issue forthwith, and as Plaintiff notes, that will do much to move the litigation forward.  So the second factor does not heavily favor a stay if it favors a stay at all.

    Next, a stay would prejudice Plaintiff, though not greatly.  Defendant is correct that mere delay does not amount to prejudice and that Plaintiff and Defendant are not direct competitors.  But Plaintiff stands to be prejudiced beyond the mere fact of delay.  If Defendant had filed its petitions for CBM and IPR proceedings nearer the beginning of the present litigation rather than nine months later, a stay instituted at or about that time would have resulted in mere delay.  But here, Plaintiff had already litigated the case through Phase I discovery and *Markman* briefings when Defendant filed the motion to stay.  The DPSO initiating Phase I discovery did not issue until five months after the case was filed.  The *VirtualAgility* court found that the second factor "heavily" favored a stay in that case because, "At the time Defendants filed their motion . . . , the case was less than four months old.  *Discovery had not yet begun* and no trial date had been set."  2014 WL 3360806, at *8 (emphasis added).  Here, Defendant did not file its petitions until after

Plaintiff had incurred significant discovery and other pre-trial expenses under the Local Patent Rules. That fact favors Plaintiff as to both the second and third factors. In addition to the case being at a more advanced stage when Defendant filed the motion to stay than was the case in *VirtualAgility*, a stay at this stage would prejudice Plaintiff, albeit retroactively, based on its having incurred needless litigation expenses. It is not clear that those expenses would be compensable via attorney's fees, but even if they were, as Plaintiff notes, a stay would give the movant (Defendant) a clear tactical advantage. That is, Defendant waited to file the petitions with the PTAB until after it had the benefit of Plaintiff's infringement contentions under the Local Rules, significant Phase I discovery, and Plaintiff's *Markman* brief. The third factor therefore does not favor a stay.

Finally, the first and fourth factors—whether a stay or its denial will simplify the issues or reduce the burden of litigation on the parties and the court—both favor Plaintiff for two reasons: (1) denial of a stay will simplify the issues and reduce the burden of litigation in this case because the *Markman* Order will issue simultaneously with the denial of the stay, whereas the grant of a stay would prevent the *Markman* Order from issuing and thereby frustrate the critical adjudications therein; and (2) it is difficult to determine that a stay will simplify the issues or reduce the burden of litigation without relying on speculation untethered to the facts of the case. The test is not whether PTAB proceedings, *if instituted*, would simplify the issues or reduce the burden of litigation. The answer to that question will probably always be "yes," because CBM and IPR proceedings can only affirm claims or invalidate them; they cannot allow new claims as in a reissue proceeding. Before the PTAB has decided whether to grant a petition for review, however, it is very difficult to assess whether a stay would simplify the issues or reduce the burden of litigation.

As Plaintiff correctly notes, the PTAB has not yet determined whether to institute CBM or IPR proceedings in this case and may not do so until February 2015, with a ruling to issue up to a year later.  Plaintiff argues that the motion is for that reason simply premature.  The Court does not agree that all stay motions are necessarily premature before the PTAB determines whether to grant a petition for CBM or IPR proceedings.  The law does not list the question as a threshold issue, and there could be cases where the second and third factors heavily favor a stay even where the first and fourth factors cannot be assessed or are assumed to counsel against a stay.  But here the second and third factors do not particularly favor a stay, and the Court will not, as Defendant urges, engage in statistical guessing as a part of its analysis of the first and fourth factors.  Simply because the PTAB has granted review in a majority of petitions since CBM and IPR proceedings have been instituted—and Plaintiff disputes Defendant's statistics, in any case—does not mean that the chance of review in the present case can be reliably predicted.  Each case presents its own unique facts, and the Court's analysis of the stay factors must be tethered to the facts of the case before it.  At most, the Court could try to determine whether Defendant is more likely than not to succeed on the merits or has shown a reasonable likelihood of success on the merits as to its claims in the CBM and IPR petitions, respectively, so as to anticipate the likelihood of a grant of the petitions. *See* 35 U.S.C. §§ 314(a), 324(a).[2]  But the Court will not spend its resources this way—examining the CBM and IPR petitions in a mini-trial—when determinations from the PTAB are forthcoming.  Although this Court is a participant in the Patent Pilot Program, and it therefore has more experience with patent law than the average district court, the Court declines to predict how the subject-matter experts at the PTAB will determine the present petitions.  Rather, because the purpose of the stay procedure is

---

2 With a few exceptions, the Post Grant Review procedures at § 324 *et seq.* apply to CBM proceedings. *See* Leahy–Smith America Invents Act § 18(a)(1).

efficiency, the Court believes the best course of action in cases such as this one, where the PTAB has not yet determined whether to grant pending petitions for review, is to treat the first and fourth factors as indeterminable and deny the stay motion unless the second and third factors strongly support a stay even in the absence of the first and fourth factors, leaving open the possibility (indeed, the likelihood) of a stay if the PTAB later grants one or more of the petitions for review.

If the PTAB were to grant one or more of the petitions for review, the Court would be much more inclined to grant a stay.  The statistics concerning ultimate success after grant of review should probably carry some weight in-and-of-themselves, whereas the statistics concerning grant of review in the first instance should not.  That is because an aggrieved party might file a petition for review for tactical reasons, regardless of the merits of the claims.  The third factor of the CBM stay test itself acknowledges this concern by requiring a district court to consider whether a stay would give the movant a tactical advantage.  An interested party should not be able to claim a high chance of success simply because it has filed a petition where a high percentage of other parties' petitions have been granted.  Under those circumstances, a direct inspection of the merits of the petition is necessary to determine the chance of its grant beyond statistical speculation, and, as noted, *supra*, the Court will not attempt to predict the PTAB's forthcoming rulings as to whether to grant the CBM and IPR petitions.  By contrast, the PTAB only grants review after it has independently assessed the merits of the claims in a petition. Where the PTAB has already determined that a CBM petition is more likely than not to succeed under § 314(a), a district court is practically bound to determine that the petitioner is likely to succeed at trial in the PTAB under § 316(e)—because the standard for institution of such review

is essentially the same as the standard for ultimate success—and that there is a likelihood that a stay will simplify the issues and reduce the burden of litigation.[3]

> Indeed, a challenge to the PTAB's "more likely than not" determination at this stage amounts to an improper collateral attack on the PTAB's decision to institute CBM review, and allowing it would create serious practical problems. As a preliminary matter, Congress made post-grant review more difficult to obtain than reexamination by raising the standard from "a substantial new question of patentability," 35 U.S.C. § 303(a) (2012), to "more likely than not . . . unpatentable," *id.* § 324(a). Congress clearly did not intend district courts to hold mini-trials reviewing the PTAB's decision on the merits of the CBM review. To do so would overwhelm and dramatically expand the nature of the stay determination. If the district court were required to "review" the merits of the PTAB's decision to institute a CBM proceeding as part of its stay determination, it would undermine the purpose of the stay. When the stay decision is then appealed to this court, we would be required to likewise review the PTAB's decision to institute a CBM proceeding. This is clearly not how or when Congress intended review of the PTAB's CBM determinations to take place. *See id.* § 141(c) ("A party to . . . a post-grant review who is dissatisfied with the final written decision of the [PTAB] . . . may appeal the Board's decision only to the United States Court of Appeals for the Federal Circuit."). The stay determination is not the time or the place to review the PTAB's decisions to institute a CBM proceeding.

*VirtualAgility*, 2014 WL 3360806, at *5. This reasoning also supports the Court's refusal to assess the likelihood the PTAB will grant review in the first instance in the context of the first and fourth factors of the CBM stay test, which assessment would also constitute a "mini-trial" of the issue before the PTAB. Although holding such a "mini-trial" *before* the PTAB has ruled whether to grant a petition would not be an "improper collateral attack" on an existing ruling of the PTAB, it would certainly undermine any contrary decision later issued by the PTAB, contrary to Congress' intent to leave this determination to the PTAB and the Federal Circuit on review. *See id.*

---

3 Even where the PTAB has only determined that an IPR petition has a reasonable likelihood of success under § 324(a), the Court still has more merits-based information than pure statistical speculation upon which to base its determination that the petitioner will succeed at trial in the PTAB under § 326(e) and that a stay will therefore simplify the issues and reduce the burden of litigation. This case is not yet at that stage.

### 2.     IPR

While there is no statute that explicitly governs motions for stay pending *inter partes* review, the District of Nevada Local Rules provide a four-part test that mirrors the first three factors of the AIA four-factor test.  The Local Rules provide that a Court considering a stay of litigation shall consider, without limitation: "(1) whether a stay will unduly prejudice or present a clear tactical disadvantage to the nonmoving party, (2) whether a stay will simplify the issues in question and the trial of the case, (3) whether discovery is complete, and (4) whether a trial date has been set." LR 16.1–20.

*Unwired Planet, LLC v. Google*, No. 3:12-cv-504, 2014 WL 301002, at *7 (D. Nev. Jan. 27, 2014) (Du, J.).  Like factors one and four of the CBM stay test, until the PTAB decides whether to institute an IPR proceeding, the analysis of factor two of the local test for stays relating to IPR proceedings cannot be properly assessed.  For the reasons given, *supra*, the Court therefore denies a stay based on the IPR petition, as well.

### B.     Claim Construction

The Court agrees with Plaintiff that the only terms requiring construction are: (1) "subscriber profile information" ('433 Patent); and (2) "location update instructions" ('359 Patent).  The other disputed terms ("transaction amounts," "obtaining transaction amounts for one or more transactions at said particular point-of-sale location," "correlating one of said transaction amounts with the user's desired transaction," "based on the subscriber profile information," "based on a comparison between the service provider information and subscriber profile information," "not selecting at least one of the plurality of candidate service providers," "not selecting . . . at least one of the plurality of candidate service providers based on the comparison between the service provider information and the subscriber profile information," "receiving a transaction confirmation from the preferred service provider," "information regarding the subscriber," "network platform," "notification server," "a notification message," "event," and "using an application . . . in accordance with location update instructions provided

by a remote server") are best given their ordinary meanings.  Construction of those terms would be an "exercise in redundancy," in some cases inherently and in other cases based on the surrounding claim language that already limits the claims in the way Defendant proposes to do by limiting the meanings of the terms.[4]

1.      **"Subscriber Profile Information"**

Plaintiff suggests construing this term to mean "information relating to a user," and Defendant suggests construing it to mean "personal information regarding a subscriber, stored before a service request is made."  The specification discusses "subscriber information" in the following passage:

> It has also been recognized that the functionality of location-based services in wireless or other communication networks can be enhanced by personalizing the services provided, that is, *by processing a location-based service request based, at least in part, on stored information regarding the subscriber*.  Such subscriber information may include, for example: account numbers, credit card numbers or other financial information; lodging information such as smoking preference, room requirements, pricing limitations, discount programs, etc.; favorite restaurants; automobile service plans; and/or a wide variety of other subscriber information. Such information allows the location based services to be tailored for the subscriber.

U.S. Patent No. 7,376,433 col. 2, ll. 13–25 (filed Dec. 17, 2004) (emphasis added).  Plaintiff's citation to this portion of the specifications omits the first sentence quoted above.  The subscriber information clearly refers to "stored" information, i.e., information that has been stored at the time a "service request" is made.  The Court therefore finds that Defendant's limiting language is appropriate.  The language also refers to "subscriber[s]" as opposed to "user[s]."  "Personal" information is not contradistinguished in the specifications from "impersonal" information and

---

4 Although Defendant throughout its brief claims that Plaintiff via its own brief "revised" its proposed constructions of various terms from their plain and ordinary meanings to something more particular, Plaintiff did no such thing.  Plaintiff's argumentation why certain terms should be given their plain and ordinary meanings because they are self-explanatory does not amount to an admission that those terms should be redundantly defined.

appears redundant given the "regarding a subscriber" language that modifies "information" in Defendant's proposed construction.  The Court cannot accept Plaintiff's proposed construction, which would remove the definitional limitations in the specifications that the information relates to a "subscriber," not just to any "user," and that the subscriber information includes only information already "stored."  The Court will therefore construe the term to mean "information regarding a subscriber, stored before a service request is made."

> 2.  **"Location Update Instructions"**

Plaintiff suggests construing this term to mean "instructions that can be executed by a wireless device to determine the location of the wireless device," and Defendant suggests construing it to mean "instructions, delivered by a server integrated with the notification server, which dynamically adjust the base location-updating algorithm in the application."  The term "location update instructions" appears only in the claims of the '359 Patent, not in the specifications.  Plaintiff therefore argues that the term should therefore retain its ordinary and customary meaning and that there is no basis for narrowing the meaning.  "Location update instructions" appears to be a broad term indicating any instructions that update the location of the device.  To the extent the term requires further explanation, Claim 1 does that directly. *See* U.S. Patent No. 8,275,359 col. 12, ll. 43–47 (filed June 3, 2011) ("providing a respective set of location update instructions to each of the plurality of wireless devices, wherein a wireless device is configured to determine and report its current location in accordance with a corresponding set of location update instructions . . . .").  In other words, according to Plaintiff, "location update instructions" are just what they sound like in the vernacular: instructions sent to the wireless devices that instruct the device to determine and report its current location.

The Court agrees with Plaintiff in part.  The term does not require that a server "dynamically adjust the base location-updating algorithm in the application."  Algorithmically controlled intervals at which a wireless device reports its location to a server are indeed disclosed in the specifications. *See id.* c. 8, ll. 65–c. 9, ll. 21.  But the limitation that the location update instructions must be "delivered by a server integrated with the notification server, which dynamically adjust the base location-updating algorithm in the application" cannot be ascertained from the specifications.  First, the word "integrated" appears in only one place in the specifications, as an example of a kind of network in which an SMS-based service can be enabled. *See id.* col. 2, ll. 36–42 ("It is noted that an SMS-based service has an advantage over certain possible solutions being considered because it is a capability that can be enabled in networks such as global system for mobile communications (GSM), code division multiple access (CDMA), and integrated digital enhanced network (iDEN), and is available on a large number of phones in use.").  There is no indication that the notification server must be "integrated" with a second server that actually delivers the location update instructions.  Second, the dynamic adjustment of the location-updating algorithm in the wireless device is optional; the interval between location updates may also be static. *Id.* col. 9, ll. 13–17.

On the other hand, the term cannot be as broadly construed as Plaintiff requests, i.e., "instructions that can be executed by a wireless device to determine the location of the wireless device."  The Brief Summary of the Invention succinctly reveals the proper limitation of the term:

> A group of wireless device users are notified of an event.  A location data determination *algorithm* is provided to a wireless device, *where the algorithm determines a frequency at which the device interacts with network elements to determine its location*.  The location data is stored in a notification server and used to identify a user at a specific location.  When a governmental or commercial

entity wishes to issue a notification, a message is provided to those users whose location is identified as being in an area defined by the entity.

*Id.* c. 3, ll. 16–24 (emphases added).  The relevant limitation, i.e., the requirement of an algorithmically determined frequency of location updates, appears in other portions of the specifications, as well. *See, e.g.*, *id.* c. 4, l. 65–c. 5, l. 35.  Plaintiff would construe the claim to include location update instructions the frequency of which are not controlled by algorithm, but which may be sent randomly, continuously, whimsically, or triggered by some event, i.e., non-algorithmically.  The specifications cannot be read to permit such a broad reading of the term "location update instructions."

In summary, the Court believes that the term is best construed as "instructions based on an algorithm downloaded to a wireless device that can be executed by the wireless device to determine its location."  This construction retains the limitation of an algorithmic method of determining update intervals without importing the non-existent limitations of "integrated" servers and the dynamic adjustment of the algorithm.

///

///

///

///

///

///

///

///

///

///

## CONCLUSION

IT IS HEREBY ORDERED that the Motion to Stay (ECF No. 71) is DENIED.

IT IS FURTHER ORDERED that the Motion to Seal (ECF No. 76) is GRANTED.

IT IS FURTHER ORDERED that the disputed terms are CONSTRUED as follows:

1. Subscriber Profile Information: "information regarding a subscriber, stored before a service request is made"

2. Location Update Instructions: "instructions based on an algorithm downloaded to a wireless device that can be executed by the wireless device to determine its location"

3. No Construction Necessary: "transaction amounts," "obtaining transaction amounts for one or more transactions at said particular point-of-sale location," "correlating one of said transaction amounts with the user's desired transaction," "based on the subscriber profile information," "based on a comparison between the service provider information and subscriber profile information," "not selecting at least one of the plurality of candidate service providers," "not selecting . . . at least one of the plurality of candidate service providers based on the comparison between the service provider information and the subscriber profile information," "receiving a transaction confirmation from the preferred service provider," "information regarding the subscriber," "network platform," "notification server," "a notification message," "event," and "using an application . . . in accordance with location update instructions provided by a remote server."

IT IS SO ORDERED.

Dated:  This 3rd day of October, 2014.

_____
ROBERT C. JONES
United States District Judge